# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## ROCK HILL DIVISION

| | |
|---|---|
| Nutramax Laboratories, Inc., and Nutramax Laboratories Veterinary Services, Inc., ) ) | Civil Action No.: 0:16-cv-01255-JMC |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **ORDER AND OPINION** |
| ) | |
| Manna Pro Products, LLC; Nutri-Vet, Wellness, LLC; and 21st Century Animal HealthCare, LLC, ) ) ) | |
| ) | |
| Defendants. ) | |
| _____) | |

In a December 1, 2016 order ("contempt order"), the court found Defendant 21st Century Animal HealthCare, LLC ("21st Century") in civil contempt for violating the terms of a July 8, 2016 joint stipulation of settlement and order ("settlement order") that had been submitted by the parties and later endorsed by the court. (ECF No. 44.) The contempt order directed 21st Century to disgorge to Plaintiffs Nutramax Laboratories, Inc., and Nutramax Laboratories Veterinary Services, Inc., (together, "Nutramax") "its net profits from all sales, on or after July 8, 2016, of products within its Essential Pet line that employ or employed packaging with comparative advertising containing the word Cosequin or that are sold or were sold through a website that employed comparative advertising containing the word Cosequin at the time of the sale." (*Id.*) This matter now comes before the court because a dispute has arisen between 21st Century and Nutramax as to the calculation of the proper amount of net profits to be disgorged. (*See* ECF Nos. 46, 49, 52.) This order resolves the dispute, and the court **ORDERS** 21st Century to disgorge to Nutramax **$11,130.14**, which, for the reasons that follow, the court determines is the proper amount of net profits to be disgorged.

# I. RELEVANT FACTUAL AND PROCEURAL BACKGROUND

In the contempt order, the court outlined the four elements that Nutramax had the burden to establish by clear and convincing evidence in order for the court to find that 21st Century was in contempt, noting that a showing of willfulness was not a required element. (*See* ECF No. 44 at 6-7 (citing *JTH Tax, Inc. v. H&R Block E. Tax Servs., Inc.*, 359 F.3d 699, 705 (4th Cir. 2004); *Ashcroft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000); *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995)).) Assessing the evidence and the parties' arguments, the court "conclude[d] that Nutramax ha[d] shown by clear and convincing evidence each of the elements needed to establish a finding of civil contempt." (*Id.* at 7.) In reaching this conclusion, the court explained that, although there was clear and convincing evidence that 21st Century knowingly violated an unequivocal command in the settlement order, Nutramax had not shown by clear and convincing evidence that 21 Century's violation was willful (*see id.* at 15) and, in fact, "the court note[d] that nothing [in the record before it] suggest[ed] a willful violation" (*id.* at 20).

In fashioning a sanction for 21st Century's civil contempt, the court emphasized that sanctions imposed for civil contempt must be only remedial and/or compensatory in nature and, unlike in the criminal contempt context, cannot be punitive in nature. (*See id.* at 17 (citing *United States v. United Mine Workers*, 330 U.S. 258 302-04 (1947); *In re Gen. Motors*, 61 F.3d at 359).) Thus, as a general rule, where the court intends a sanction in the form of a fine to be compensatory, the fine imposed should not exceed the actual loss to the complainant caused by the contumacy. (*See id.* (citing *In re Gen. Motors*, 61 F.3d at 359); *In re Tetracycline Cases*, 927 F.2d 411, 413 (8th Cir. 1991)).) For civil contempt proceedings arising from trademark infringement actions, such as this one, the court noted that requiring the contemnor to disgorge its net profits from the infringing activity to the complainant is an oft-used compensatory sanction. (*See id.* at 18 (citing

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5-6 (2d Cir. 1989); *Buffalo Wings Factory, Inc. v. Mohd*, 574 F. Supp. 2d 574, 581-82 (E.D. Va. 2008); *Colonial Williamsburg Found. v. Kittinger Co.*, 792 F. Supp. 1397, 1407-08 (E.D. Va. 1992)).) Thus, the court determined that it was "appropriate to order 21st Century to disgorge its net profits from all sales, on or after July 8, 2016, of products within its Essential Pet line that employ or employed packaging with comparative advertising containing the word Cosequin or that are sold or were sold through a website that employed comparative advertising containing the word Cosequin at the time of the sale." (*Id.* at 18-19.) In the court's view, this disgorgement of net profits was "necessary to compensate Nutramax for the injury to its rights under the Settlement Order," was "an appropriate means to coerce 21st Century's compliance with the Settlement Order's terms," and "ensure[d] that the disgorgement does not become punitive in nature." (*Id.* at 19.) Accordingly, the court ordered 21st Century to disgorge the profits so described, but, anticipating the instant dispute, ordered 21st Century to first "file with the court and serve on Nutramax a statement disclosing all of its sales and net profits . . . that are subject to this disgorgement order and explaining how such net profits were calculated." (*Id.* at 21.)

On January 6, 2017, 21st Century, in compliance with the court's contempt order, filed a statement disclosing its sales subject to disgorgement and explaining how it calculated the net profits therefrom. (ECF No. 46.) It asserts that the amount of net profits from sales subject to the order is $10,912.00. (*Id.* at 2-3.) To reach this amount, 21st Century begins by pointing to an exhibit of a spreadsheet (the "primary spreadsheet") containing sales and cost information for three products by reference to each product's stock keeping unit ("SKU") number. (*See* ECF No. 46 at 2; ECF No. 46-2.) For the three SKU numbers combined, the spreadsheet shows that 11,100 units were sold during the relevant period, resulting in $80,314.00 in sales. (*See* ECF No. 46 at 2; ECF

No. 46-2.) To substantiate these figures, 21st Century provides 65 invoices from retailers across the United States, reflecting the number of offending units sold in the relevant period (*see* ECF Nos. 46-3, 46-4, 46-5), and another spreadsheet breaking down the units sold by date, invoice number, and SKU number (*see* ECF No. 46-6).[1] 21st Century also provides the sworn declaration of its chief financial officer, Jim Jumpeter, who states that figures on the primary spreadsheet accurately represent the total number of units sold and total sales revenue therefrom, as derived from the invoices. (*See* ECF No. 46-1 at 1-2.)

From the sales revenue amount of $80,314.00, 21st Century makes two deductions, one deduction for the raw material costs in producing the offending products and another deduction for labor and overhead costs in producing the offending products. (*See* ECF No. 46 at 2-3; ECF No. 46-1 at 2-4.) First, 21st Century asserts that the total raw material costs amounted to $50,100.00. (ECF No. 46 at 2.) To reach this figure, 21st Century points to three cost variances reports that provide the per-unit average raw materials cost for each of the three offending products. (*See* ECF No. 46 at 2 (citing ECF No. 46-7); ECF No. 46-1 at 3 (same).) The cost variance report for SKU 27358 shows a raw materials cost of $8.33987 per unit; for SKU 27359, a cost of $3.69612 per unit; and for SKU 27390, a cost of $3.14574 per unit. (*See* ECF No. 46-7.) However, in his affidavit, Jumpeter states that "the raw material costs vary by lot, and the estimated average for [each SKU] can be found in the handwritten notes on each [cost variances report]." (ECF No. 46-1 at 3.) Attached to each of the three cost variances reports is a yellow sticky note containing a handwritten estimated average of the raw material cost for each SKU, apparently intended to account for the fact that the raw material costs for the lots subject to the contempt order differ slightly from the raw material costs for the lots that are the subject of the cost variances

---

[1] The court's own review of the invoices discloses gross sales in the amount of $80,313.62.

reports. For SKU 27358, a sticky note lists the raw material cost as $8.4553 per unit; for SKU 27359, a sticky note lists the cost as $3.6728 per unit; for SKU 27390, a sticky note lists the cost as $3.1458 per unit. (*See* ECF No. 46-7.) The primary spreadsheet shows that during the relevant period, 21st Century sold 2,544 units of SKU 27358, 3,228 units of SKU 27359, and 5,328 units of SKU 27390. (ECF No. 46-2 at 2.) Although the primary spreadsheet calculates the total raw material costs for the three SKUs as $50,127.00 (*id.*), in Jumpeter's affidavit and in 21st Century's response to the contempt order, the figure is stated as approximately $50,100.00 (*see* ECF No. 46 at 2; ECF No. 46-1 at 3).[2]

Second, 21st Century asserts that the total labor and overhead costs amounted to $19,200.00, with $9,600.00 allocated to labor and $9,600.00 allocated to overhead. (*See* ECF No. 46 at 2.) In reaching these figures, 21st Century admits that it does not track its labor and overhead costs by individual SKU. (*Id.*) Instead, 21st Century relies on Jumpeter's sworn statement that using 12% of sales revenue from each SKU to estimate overhead costs and another 12% of sales revenue to estimate labor costs would be a conservative method of estimating overhead and labor costs. (*Id.* at 2-3; ECF No. 46-1 at 3-4.) The primary spreadsheet lists the overhead and labor costs for SKU 27358 as $3,028.00 each, for a total of $6,056.00; for SKU 27359 as $2,222.00 each for a total of $4,444.00; and for SKU 27390 as $4,388 each, for a total $8,776.00. (ECF No. 46-2.) Although, adding these figures together, the primary spreadsheet arrives at figures of $9,638.00 for overhead and another $9,638.00 for labor (*id.*), which would total $19,276.00, in Jumpeter's

---

[2] If the sticky note amounts are used, simple math ((2,544 units × $8.4553 per unit) + (3,228 units × $3.6728 per unit) + (5,328 units × $3.1458 per unit)) demonstrates that the total raw material costs are equal to $50,126.904, which may be rounded down to $50,126.90. If the amounts on the cost variances reports are used instead, then the calculation ((2,544 units × $8.33987 per unit) + (3,228 units × $3.69612 per unit) + (5,328 units × $3.14574 per unit)) yields a total raw material cost of $49,908.20736, which may be rounded up to $49,908.21.

affidavit and in 21st Century's response to the contempt order, the figures are stated as approximately $9,640.00 (*see* ECF No. 46 at 2; ECF No. 46-1 at 3), which would total $19,280.00.[3]

Subtracting the figure of $50,100.00 in total raw material costs and the figure of $19,280.00 in labor and overhead costs from the figure of $80,314.00 in gross sales, Jumpeter and 21st Century arrive at a net profit of $10,912.00 for the three SKUs. (*See* ECF No. 46 at 2-3; ECF No. 46-1 at 3-4.) 21st Century asserts that this amount—$10,912.00—is the amount of net profits on the offending products that is subject to disgorgement under the court's contempt order. (*See* ECF No. 46; ECF No. 46-1.)

On January 11, 2017, Nutramax filed an objection to 21st Century's response to the contempt order. (ECF No. 49.) In its objection, Nutramax first asserts that the court, in calculating the net profits from sales of the offending product during the relevant period, should not rely on the $80,314.00 figure that 21st Century advances as its gross revenue from sales of the offending products during the period. (*Id.* at 1-5.) Nutramax argues that the invoices 21st Century attaches to its response to the contempt order demonstrates that, soon after Nutramax notified 21st Century that it sought to enforce the settlement order by forcing 21st Century to pull the offending products off the shelves, 21st Century "slashed [the] prices" of the offending products "and flooded the marketplace with products in violation of its agreement with Nutramax and in contempt of [the settlement order]." (*Id.* at 1.) In support of this argument, Nutramax points out that after it sent a cease and desist email to 21st Century on August 27, 2016 (*see* ECF No. 37-3), and after it filed its motion for contempt on August 30, 2016 (*see* ECF No. 34), identifying the three products at

---

[3] If the per-SKU sales as listed on the primary spreadsheet and the 12% figure offered by Jumpeter are used, then simple math (($25,231.00 in sales × 12% for overhead) + ($25,231.00 in sales × 12% for labor) + ($18,518.00 in sales × 12% for overhead) + ($18,518.00 in sales × 12% for labor) ($36,564.00 in sales × 12% for overhead) + ($36,564.00 in sales × 12% for labor)) results in total overhead and labor costs that are equal to $19,275.12.

issue, 21st Century, on September 12, 2016, reduced the price for each offending product by roughly 25% from their prices on August 18, 2016, the date on which the products had their best sales within the relevant period (*see* ECF No. 49 at 2-3 (citing ECF No. 49-1)). Nutramax also points out that, on September 13, 2016, 21st Century sold some of the offending products at prices lower than the prices at which they had been sold on August 18, 2016, amounting to a price drop of roughly 21% for two of the products and 17% for the third product. (ECF No. 49 at 3.)[4] As suggested above, Nutramax argues that 21st Century's decision to "slash" prices and "dump" its product into the market was a willful attempt to flout the settlement order and preempt its enforcement:

> 21st Century's motive for dumping more than 7,000 Nonconforming Products after the filing of the contempt motion is clear. Nutramax's contempt motion sought an order prohibiting further contemptuous sales of the Nonconforming Products. Knowing Nutramax was likely to prevail on its motion, 21st Century quickly offloaded all of its Nonconforming Products to shortcircuit this Court's ability to enforce its prior order and grant the relief sought by Nutramax. In short, 21st Century robbed Nutramax of the bargained for and Court-ordered benefit of a brightline distinction between the two parties.

(*Id.* at 3-4.) Because 21st Century attempted to preempt enforcement of the settlement order by deflating the price of the offending products, Nutramax argues that the court should calculate the gross revenue from sales of the offending products as if each unit had been sold at the price charged on August 18, 2016, which results in gross profits in the amount of $94,452.08 rather than the $80,314.00 figure advanced by 21st Century. (*Id.* at 4-5.)

---

[4] Only three invoices reflect sales of the offending products on September 13, 2016. (*See* ECF No. 49-1 at 22, 24, 28.) Of those three, two invoices show sales at the same price as charged on August 18, 2016, and the other shows sales at the same price as charged on September 12, 2016. (*See id.*) Although Nutramax's brief is not clear on this point, it appears to argue that the weighted average of these three invoices demonstrates an overall price drop for September 13, 2016.

Second, Nutramax argues that the court should not permit 21st Century, in calculating its net profits from sales of the offending products during the relevant period, to deduct from its gross sales the cost of the raw materials used to manufacture the products. (*See id.* at 5-8.) Borrowing from the law governing disgorgement of profits in the trademark infringement context, Nutramax argues that 21st Century has the burden to prove any deductions in cost from gross revenues in determining the net profit from sales of offending products (*see id.* at 6 (citing 15 U.S.C. § 1117(a))) and that this burden is not carried by conclusory, unsubstantiated evidence of costs (*see id.* (citing *Choice Hotels Int'l Inc. v. Zeal, LLC*, 135 F. Supp. 3d 451, 472 (D.S.C. 2015))). Nutramax asserts that the handwritten sticky note estimations of the average per-unit raw material costs do not satisfy the burden of proving that those amounts should be deducted from the gross sales amount. (*See id.* at 6-7.) The sticky notes, Nutramax argues, amount to a conclusory, unsubstantiated assertion of cost that cannot satisfy 21st Century's burden of proof. (*See id.* at 7 (citing *Zeal*, 135 F. Supp. 3d at 475).)

In this vein, Nutramax, again borrowing from the law governing disgorgement in trademark infringement cases, argues that "the [c]ourt should not have any qualms about . . . awarding Nutramax the full amount of [21st Century's] gross revenue." (*Id.*) Nutramax explains that, when a trademark infringer fails to meet its burden to prove a cost deduction from its gross revenues, a court, in the course of determining the net profits to be disgorged, should treat the full amount of gross revenues as if they were the profits subject to disgorgement. (*See id.* (citing, *inter alia*, *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 207 (1942); *Zeal*, 135 F. Supp. 3d at 475; *Entrepreneur Media, Inc. v. JMD Ent. Group, LLC,* 958 F. Supp. 2d 588, 597 (D. Md. 2013)).) Thus, Nutramax argues that, if the court concludes that 21st Century failed to meet its evidentiary burden as to costs, the court should not hesitate to award Nurtramax all the

gross revenues from the offending products sold during the relevant period for 21st Century's contumacy. (*See id.* at 7-8.)

Third, Nutramax argues that the court should not permit 21st Century to deduct from its gross revenues from the offending products the cost of labor and overhead. (*See id.* at 8-10.) Again borrowing from the trademark infringement context, Nutramax argues that labor and overhead are fixed costs that 21st Century would incur regardless whether it manufactured the offending products and that such fixed costs are not deductible from gross sales. (*See id.* at 8 (citing *Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238 (11th Cir. 2000); *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1373 (S.D. Ga. 2003); Restatement (Third) of Unfair Competition § 37 cmt. h (1995)).) Nutramax further argues that, although some courts will allow such fixed costs to be deducted when the infringer establishes a sufficient nexus between the fixed costs and the manufacturing of the infringing product, the Fourth Circuit has not expressly approved this approach. (*See id.* at 8-9 (citing *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 107 (2d Cir. 1999); *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 325 F. Supp. 2d 841, 853 (M.D. Tenn. 2004)).) Applying these rules to the instant case, Nutramax argues that 21st Century may not deduct labor and overhead costs from its gross revenue from the offending products. (*See id.* at 9-10.) Nutramax further argues that, even if the court allowed such deductions upon a showing of a sufficient nexus between the labor and overhead costs and the manufacturing of the offending products, 21st Century has failed to even assert such a nexus. (*See id.*)

In reply to Nutramax's objection, 21st Century emphasizes the portions of the court's contempt order explaining that civil contempt remedies should be compensatory and remedial rather than punitive. (*See* ECF No. 52 at 1-2; *see also* ECF No. 44 at 17, 19 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193-94 (1949); *United Mine Workers*, 330 U.S. at 302-04;

*In re Gen. Motors*, 61 F.3d at 259; *In re Tetracycline Cases*, 927 F.2d at 413).) 21st Century argues that it would be inappropriate to inflate the amount of gross revenues from sales of the offending products by treating sales on September 12 and 13, 2016, as if they were sold at August 18, 2016 prices. (*Id.* at 2-3.) 21st Century argues that inflating the gross revenues in this way would amount to a punitive, rather than compensatory, measure and would be inappropriate not only because civil contempt proceedings do not allow for punitive sanctions but also because there are numerous legitimate business reasons that 21st Century might have for reducing the offending products' sale price and because the court already found that 21st Century's violation of the settlement order was not willful. (*See id.*)

Next, 21st Century asserts that the court should permit it to deduct the raw material costs from the gross revenues in determining net profits from the sales of the offending products and should reject Nutramax's arguments to the contrary for several reasons. (*See id.* at 3-4.) 21st Century argues that Nutramax should know of the costs involved in production because it is a participant in the same market but that, instead of bringing forth evidence of why 21st Century's estimates are incorrect, Nutramax only relies on legal arguments that an infringer must come forward with evidence. (*Id.* at 3.) 21st Century also argues that its reliance on the estimates placed on the sticky notes is sufficient to calculate the raw material costs because it simply takes into account the fact that the cost variances reports do not account for small variations in raw material costs for each lot of products, and the sticky note estimates take account of this difference. (*See id.* at 3-4.) 21st Century points out that there is only a slight difference of result if the court relies on the cost variances reports alone to calculate the raw material costs rather than using the sticky note estimates, and, because there appears to be no dispute as to the validity of the cost variances report, there should be no real challenge to using the sticky note estimates. (*See id.*) 21st Century also

avers that the information it used to develop the estimates on the sticky notes is proprietary, that 21st Century is unwilling to disclose the information, and that 21st Century would be amenable to an *in camera* review of the information if the court found it necessary. (*See id.* at 3.)

Lastly, 21st Century asserts that it should be permitted to deduct labor and overhead costs from gross sales of the offending products in determining the net profit subject to disgorgement. (*See id.* at 4-6.) 21st Century points out that, although the Fourth Circuit has not addressed whether labor and overhead costs may be deducted from gross sales in determining a trademark infringer's disgorgement from sales of offending products, other courts have concluded that such deductions should be made. (*See id.* (citing *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 103 (2d Cir. 1989); *Taylor v. Meirick*, 712 F.2d 1112, 1121 (7th Cir. 1983); *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 665 (2d Cir.1970); *Andrew Corp. v. Gabriel Elecs., Inc.*, 785 F. Supp. 1041, 1049 (D. Me. 1992)).) 21st Century also argues that Jumpeter's 12% estimates for overhead and labor costs are reasonable. (*See id.* at 5-6.)

## II. APPLICABLE LAW

"A court may impose sanctions for civil contempt 'to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy.'" *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004) (quoting *In re Gen. Motors*, 61 F.3d at 258). "The appropriate remedy for civil contempt is within the court's broad discretion." *In re General Motors*, 61 F.3d at 359 (citing *McComb*, 336 U.S. at 193-94). "However, the remedies and sanctions must be remedial and compensatory and, unlike criminal contempt, nonpunitive." *Id.* (citing *United Mine Workers*, 330 U.S. at 302-04). "'Generally, a compensatory sanction may not exceed the actual loss to the complainant caused by the actions of respondent, lest the contempt

fine become punitive in nature, which is not appropriate in a civil contempt proceeding.'" *Id.* (internal quotation marks omitted) (quoting *In re Tetracycline Cases*, 927 F.2d at 413).

"Recovery of wrongful revenues or net profits earned from infringing activity [is a] well-settled . . . civil contempt remedy for violation of trademark consent orders." *Buffalo Wings Factory*, 574 F. Supp. 2d at 581-82 (citing *Colonial Williamsburg*, 792 F. Supp. at 1407-08; *Manhattan Indus., Inc.*, 885 F.2d at 5-6). "In fact, courts in the past have used the Lanham Act as a guide to structure civil contempt sanctions." *Schwartz v. Rent-A-Wreck of Am.*, No. PJM 07-1679, 2017 WL 2838472, at *10 (D. Md. June 29, 2017) (citing *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1519 (11th Cir. 1990); *Colonial Williamsburg Found.*, 792 F. Supp. at 1407, n.4; *Consol. HVAC, Inc. v. All State Plumbing, Inc.*, 2006 WL 2563367, at *5 (D. Md. Aug. 30, 2006)). In determining the amount of profits attributable to a trademark infringement under the Lanham Act, the trademark owner has the burden to prove the gross sales of the offending products, and the burden is on the infringer to "'prove all elements of cost or deduction claimed.'" *Zeal*, 135 F. Supp. 3d at 472 (quoting 15 U.S.C. 1117(a)); *accord Muhler Co, Inc. v. Window World of N. Charleston LLC*, No. 2:11-cv-00851-DCN, 2014 WL 4269078, at *7 (D.S.C. Aug. 28, 2014).

To satisfy its burden of proving deductions, an infringer must first prove that the claimed deduction is of a type allowed to be deducted under the Lanham Act and then prove the amount of the cost to be deducted. *See Muhler*, 2014 WL 4269078, at *7. "'If the infringer provides *no* evidence from which the court can determine the amount of any cost deductions, there is no obligation to make an estimate, . . . costs need not form any part of the calculation of profits,'" and "the court may award proceeds as if they were profits." *Zeal*, 135 F. Supp. 3d at 472 (internal quotation marks omitted) (quoting 5 J. Tomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:66 (4th ed.)) (citing, *inter alia*, *Entrepreneur Media, Inc. v. JMD Ent. Group*,

*LLC*, 958 F. Supp. 2d 588, 597 (D. Md. 2013)). Moreover, the infringer's evidence of deductible costs must be sufficient enough for the court to make reasonably accurate findings, and, thus, "[t]he infringer's burden of proving deductible costs is not carried by records showing only a vague, undifferentiated category of [costs].'" *Id.* (quotation marks omitted) (quoting 5 McCarthy, *supra*, § 30:66). Nevertheless, the court retains wide discretion in determining the amount of net profits to be disgorged, *see Zeal*, 135 F. Supp. 3d at 473, which includes the discretion to estimate deductible costs, *see* 5 McCarthy, *supra*, § 30:66.

## III. ANALYSIS

### A. Amount of gross sales

The parties first dispute the amount of gross sales of the offending products from which net profits should be calculated. 21st Century, in compliance with the court's contempt order, submitted numerous invoices demonstrating that its actual gross revenues from sales of the offending products amounted to $80,314.00. Nutramax does not contest this amount of actual gross sales derived from the invoices, but instead argues that the court should constructively increase this amount to $94,452.08 because 21st Century's decision to reduce the sale prices on the offending products on September 12 and 13, 2016, after Nutramax had sent 21st Century a cease-and-desist email and had filed its motion for contempt.

It is clear from Nutramax's arguments on this front that it seeks a constructive increase of the gross sales amount on the ground that 21st Century willfully violated the settlement order. (*See* ECF No. 49 at 1-5.) Nutramax's arguments emphasize 21st Century's "motive for dumping" the offending products, its "[k]now[ledge]" that Nutramax sought to enforce the settlement order by challenging the offending products, its "robb[ery]" of Nutramax's "bargained[-]for . . . benefit" under the settlement order, its "violation of its agreement with Nutramax," and its "contempt" of

the settlement order. (*Id.* at 1, 3-4.) Although Nutramax argues that "[t]his sort of conduct should not be countenanced or rewarded," it provides no legal authority for the proposition that a court, in determining the net profits to be disgorged in a civil contempt proceeding, may constructively inflate the amount of gross sales attributable to offending products because of the contumacious party's willfulness in violating the underlying order. Such a proposition here raises several interrelated problems.

First, in the trademark infringement context, a successful plaintiff generally is entitled to recover profits in excess of the amount of actual net profits only when the infringer has intentionally infringed on the trademark. *See* 15 U.S.C. § 1117(b). And, in such instances, the award of profits will exceed the actual net profits through a statutory trebling of the actual net profits and not by means of constructively inflating the amount of gross sales. *See id.* Aside from statutory trebling, the Ninth Circuit, in *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d at 1135 (9th Cir. 1986), concluded that an infringer's profits from selling counterfeit products at cost should include all of the gross revenues on sales of the counterfeit products, which practically resulted in the plaintiff recovering more than actual net profits. *See Polo Fashions*, 793 F.2d at 1134-35. Notably, in the *Polo Fashions* case, the trial court had found that the infringer knew the products were counterfeit and had sold the products at cost, after the trademark owner filed suit, in order to avoid the losses that would have resulted from being unable to recoup the cost of obtaining the counterfeit products. *Id.* at 1133. Under these circumstances, the Ninth Circuit determined that the trial court should award the amount of gross sales, rather than actual net profit, as the net profit in order to take all the economic incentive out of trademark infringement. *Id.* at 1134-35.

Both the Lanham Act and *Polo Fashions* demonstrate that an award of profits in the trademark context should exceed properly calculated actual net profits derived from sales of the infringing product only if the infringer knew the products it sold infringed on the plaintiff's trademark and intended to infringe on the trademark. Assuming the court could straightforwardly apply the principles from the Lanham Act and *Polo Fashions* here in a civil contempt context, the court concludes that Nutramax has not demonstrated[5] that 21st Century had the requisite knowledge and intent. Nutramax asserts that 21st Century's motives for reducing the offending products' prices are clear, but Nutramax points to no evidence aside from the invoices that 21st Century reduced the prices and the fact that it did so after Nutramax filed its motion for contempt. However, the mere fact that Nutramax filed a motion claiming that the products were subject to the settlement order does not show that 21st Century acted *knowing* that the products were subject to the settlement order and *intending* to violate the settlement order. As 21st Century correctly points out, there is evidence that it had legitimate business reasons for reducing the prices at the time it did so, for instance, there is evidence that the products were scheduled to be discontinued in early 2017, which might cause 21st Century to discount their prices in September 2016. (*See* ECF No. 37-1 at 2.) Moreover, even if Nutramax had demonstrated the requisite knowledge and intent, it has still pointed to no authority (and the court has not discovered any) permitting a court to constructively inflate the gross sales amount as a method of awarding profits in excess of the actual net profits.

Second, although in the trademark infringement context Nutramax has only the relatively light burden of proving 21st Century's gross sales of the offending products, it attempts to prove

---

[5] See the paragraph below describing Nutramax's burden in this regard.

an inflated gross sales amount by demonstrating 21st Century's contumacious behavior, and, in the civil contempt context, Nutramax shoulders the heavier burden of proving contumacy by clear and convincing evidence.[6] For the reasons set forth in the preceding paragraph, the court concludes that Nutramax has not shown by clear and convincing evidence that 21st Century's decision to reduce the prices of the offending products amounted to contumacious behavior.

Third, although the court, in determining the amount of profits to be disgorged, is guided by the law of trademark infringement, the court is not called upon here to enforce remedies available to a plaintiff that has succeeded in a trademark infringement action but, instead, is called upon to impose sanctions for civil contempt. In civil contempt proceedings there is a strong policy against sanctions that are punitive rather than compensatory and remedial. Indeed, the Fourth Circuit has emphasized that civil contempt "sanctions *must* be remedial and compensatory and . . . nonpunitive" and that a "'sanction . . . [that] exceed[s] the actual loss of the complainant caused by actions of respondent . . . become[s] punitive in nature . . . [and] is not appropriate in a civil contempt proceeding.'" *In re Gen. Motors*, 61 F.3d at 259 (emphasis added) (internal quotation marks omitted) (quoting *In re Tetracycline Cases*, 927 F.2d at 413) (citing *United Mine Workers*,

_____

[6] A party requesting the court to hold an alleged contemnor in civil contempt must show by clear and convincing evidence that the alleged contemnor violated a court's decree and had knowledge of the violation. *See In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 202 (4th Cir. 2010) (quoting *Ashcraft*, 218 F.3d at 301); *N.L.R.B. v. Standard Trouser Co.*, 162 F.2d 1012, 1014 (4th Cir. 1947). Once contempt has been found by clear and convincing evidence, the party then has the burden to prove compensatory damages by a preponderance of the evidence. *See In re Gen. Motors Corp.*, 110 F.3d 1003, 1018 (4th Cir. 1993). Here, the court believes that application of the preponderance standard would be inappropriate because Nutramax asks the court to constructively inflate the gross sales amount (and thereby inflate the amount of compensatory damages awarded in this contempt proceeding) *specifically because* it alleges that 21st Century acted contumaciously in reducing the products' prices, which had the effect of deflating the gross sales amount. Because Nutramax's entire argument for constructively inflating the gross sales amount rests on its request that the court find that 21st Century acted contumaciously, the court will apply the clear-and-convincing-evidence burden of proof.

16

33 U.S. at 302-04). There might be instances in which a court could constructively inflate the gross sales of offending products in determining the net profits to be disgorged as a compensatory remedy in a civil contempt proceeding. Here, however, Nutramax does not attempt to show how constructive inflation would compensate Nutramax for any losses it has sustained or how it would compel 21st Century's compliance with the settlement order. Indeed, Nutramax's entire argument is that the court should constructively inflate 21st Century's gross sales amount not as a means of compensating Nutramax for losses it sustained or to ensure 21st Century's compliance with the settlement order but, rather, as a means of punishing 21st Century for what Nutramax perceives as contumacious behavior. Thus, the sanction Nutramax seeks appears punitive in nature and would be an inappropriate sanction in a civil contempt proceeding.

In sum, because Nutramax has not shown that 21st Century acted with the requisite knowledge and intent when reducing the prices on the offending products, because it has not proven by clear and convincing evidence that the reduction in prices amounts to contumacious behavior, and because the sanction of constructive inflation of the gross sales amount that Nutramax seeks would be punitive in nature, the court declines to constructively inflate the gross sales amount. The court finds from the evidence in the record that the gross revenues from sales of the offending product during the relevant period was $80,313.62. *See*, *supra*, note 1.

## B. Raw material costs deduction

Nutramax next argues that the court should not permit 21st Century, in calculating its net profits from sales of the offending products, to deduct from gross sales the cost of raw materials. Nutramax concedes that raw material costs are generally deductible in the trademark infringement context, *see* Restatement (Third) of Unfair Competition § 37 cmt. g; however, it argues that 21st Century's proffered evidence of raw material costs in the form of handwritten estimates on sticky

notes fails to satisfy the burden placed on an infringer to prove deductible costs, *see* 5 McCarthy, *supra*, § 30:66.[7] The court agrees.

The only evidence 21st Century offers for the raw material costs deduction it seeks are the handwritten sticky notes and Jumpeter's attestation that the estimates on the sticky notes are the per-unit raw material costs for the lots in question. 21st Century offers no explanation or corroborating documentation as to how it arrived at these estimates except for the fact that they are relatively close to the per-unit raw material costs referenced in the cost variances reports.[8] This type of unsubstantiated attestation as to the amount of an otherwise deductible category of cost is simply not enough to satisfy the burden imposed on 21st Century in the trademark infringement context. *See Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*, No. 1:08-cv-2376-TWT, 2010 WL 2662720, at *13 (N.D. Ga. June 30, 2010) (collecting cases); *see also Bambu Sales, Inc.*

---

[7] 21st Century seems to argue that the court should reject Nutramax's argument in part because Nutramax, despite having extensive knowledge of the costs involved in the relevant market, does not provide any evidence that the raw material costs 21st Century asserts are incorrect or excessive and does not appear to challenge the asserted raw material costs on this basis. To the extent 21st Century complains that Nutramax has provided no countervailing evidence as to the raw material costs, Nutramax is under no obligation to do so until 21st Century, the party bearing the burden of proof on this issue, comes forward with evidence in its favor. *Cf. Semcon Tech, LLC v. Micron Tech., Inc.*, 660 F. App'x 908, 914 (Fed. Cir. 2016); *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994); *Zipit Wireless Inc. v. Blackberry Ltd.*, No. 6:13-cv-02959-JMC, 2016 WL 5933975, at *6 (D.S.C. Oct. 12, 2016).

[8] 21st Century asserts that the data underlying its sticky note estimates is proprietary information, that it is unwilling to disclose the data to Nutramax, but that it would be willing to submit it to the court for *in camera* review. The court declines to take up 21st Century's suggested *in camera* review. In the contempt order, the court directed 21st Century to disclose the net profits from sales of the offending products and to explain how the net profits were calculated. (*See* ECF No. 44 at 21.) It should have been obvious that a response to the order containing unexplained and unsubstantiated estimates of deductible costs on sticky notes was dubious and would invite objection. If 21st Century thought that the estimated amounts should be deducted but that the data underlying the estimates should be protected from disclosure, it could have sought protection from disclosure before responding to the contempt order. The court is disinclined to grant a request for *in camera* review that is not made by motion, *see* Fed. R. Civ. P. 7(b)(1), and that comes only after the requesting party (that has already been found in contempt) is forced into making such a request based on an objection from the opposing party that was obvious from the beginning.

*v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995); *U.S. Soo Bahk Do Moo Duk Kwan Fed'n, Inc. v. Tang Soo Karate School, Inc.*, No. 3:12-cv-00669, 2015 WL 4920306, at *36 (M.D. Pa. Aug. 17, 2015); *Hanesbrand, Inc. v. Seduzione Leggs, LLC*, No. 4:11-cv-00569-BCW, 2015 WL 12781218, at *3 (W.D. Mo. Feb. 6, 2015); *Tamkoo Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, No. Civ. 99-388-JD, 2000 WL 1745078, at *2 (D.N.H. Oct. 19, 2000); *Nutrividia, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1316 (S.D. Fla. 1998); *Dolori Fabrics, Inc. v. Ltd., Inc.*, 662 F. Supp. 1347, 1356-57 (S.D.N.Y. 1987). Accordingly, the court concludes that 21st Century is not entitled to the deduction of raw material costs estimated on the sticky notes.

Despite 21st Century's not being entitled to the sticky note estimates of raw material costs, the court concludes that 21st Century is permitted to a deduction for raw material costs in the amounts provided in the cost variances reports. Notably, Nutramax only challenges the estimates contained on the sticky notes on the ground that they amount to insufficient evidence of the cost to be deducted and never challenges the amounts of per-unit raw material costs contained in the cost variances reports. The cost variances reports appear sufficiently authenticated by Jumpeter's affidavit and otherwise appear sufficient for the court to make a finding as to the raw material costs for the offending products during the relevant period. Moreover, although in the trademark infringement context the court may award gross revenues as net profits in the absence of sufficient proof of deductible costs, in the court's view, such a practice should be avoided in the civil contempt context because of the strong policy against punitive sanctions in the latter context. Accordingly, the court finds that it is appropriate to deduct $49,908.21 in raw material costs from the gross sales of the offending products. *See*, *supra*, note 2.

## C. Labor and overhead cost deductions

Lastly, Nutramax argues that the court should not permit 21st Century, in calculating its net profits from sales of the offending products, to deduct from gross sales the cost of labor and overhead. As a preliminary matter, Nutramax invites the court to conclude that fixed costs, such as labor and overhead costs, are not deductible as a matter of law. Whether and to what extent fixed costs may be deducted from gross sales in the trademark infringement context continues to "present[] difficult legal and accounting problems." 5 McCarthy, *supra*, § 30:68. Some courts refuse to allow deductions for fixed costs when it appears that the costs would be incurred even if the offending products had not been manufactured and sold.[9] *See, e.g.*, *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1373 (S.D. Ga. 2003) (citing *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 586 (5th Cir. 1980); *Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000)). However, a number of other courts, especially in the Second Circuit, permit infringers to deduct such fixed costs so long as they prove a sufficient nexus between the fixed cost and the sale of the offending product. *See, e.g.*, *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 268-69 (W.D.N.Y. 2013). Nutramax asks the court to side with the authorities holding that, generally, fixed costs may not be deducted. To the extent the court sides with the authorities allowing such deductions, Nutramax argues that 21st Century has not demonstrated a sufficient nexus between its 12% estimates for labor and overhead costs and the sale of the offending products.

---

[9] Nutramax relies heavily on Restatement (Third) of Unfair Competition § 37 cmt. h for the proposition that an infringer is not permitted to deduct fixed costs like overhead and labor from gross sales. (*See* ECF No. 49 at 8.) However, the comments for § 37 are hardly clear on this point. *See id.* § 37 cmt. g ("Labor . . . associated with the production of infringing goods [is] generally deductible."); *id.* ("The defendant may deduct the cost of labor . . . expended in producing the infringing goods . . . ."); *id.* § 37 cmt. h ("[S]ome courts allocate a proportion of overhead and other fixed costs.").

The court declines Nutramax's invitation. In the court's view, it is unnecessary in this civil contempt proceeding to choose a side on the issue, and it is likewise unnecessary to determine whether 21st Century has satisfied the Second Circuit's requirement to prove a sufficient nexus between the asserted labor and overhead costs and the sale of the offending products. The court observes that in the trademark infringement context, even when an infringer fails to offer any evidence supporting a deduction for fixed costs, courts have relied on estimations of such fixed costs and deducted them from gross sales in order to avoid imposing punitive sanctions on the infringer. *See Choice Hotels Int'l, Inc. v. Fisher*, No. 2:13-cv-23, 2015 WL 12748029, at *7 (N.D.W. Va. Apr. 1, 2015) (explaining that, even where "the defendant has failed to provide any evidence . . . [of] any cost deductions," the court "will not award th[e] full amount" "of the defendant's estimated gross sales," because doing so would "produce results that are . . . punitive in nature"); *Muhler*, 2014 WL 4269078, at *7 (explaining that, even where infringer "provided no evidence to establish any costs or deductions from gross revenues," an award of all gross revenues "does not take into account [the infringer]'s profit margin" and "would almost certainly penalize [the infringer] instead of compensating [the trademark owner]," and, thus, "a reasonable approximation" was appropriate); *Nutrivida*, 46 F. Supp. 2d at 1316 (estimating $1 million as deductible costs for both advertising and telemarketing despite infringer offering insufficient documentary evidence for these costs). Courts have also relied on estimations in the civil contempt context as a means of avoiding punitive sanctions. *See Colonial Williamsburg*, 792 F. Supp. at 1408 (explaining that, although "[t]he burden of proof rests on the defendants to prove any deductions for its costs from the gross revenues attributable to its contempt," "it would be inequitable and unnecessarily excessive to force the defendants to repay all revenues derived from the sale of [the offending p]roducts," as the contemnor "certainly incurred substantial overhead in

the production of the [offending p]roducts" (internal quotation marks omitted)); *id.* (implicitly estimating net profits as one third of gross sales and costs as two thirds of gross sales).

Here, in the court's view, awarding Nutramax profits that fail to take into account a proportion of the labor and overhead costs 21st Century incurred would be punitive and thus inappropriate for a civil contempt sanction. Although 21st Century's evidence of labor and overhead costs—Jumpeter's attestation that 12% of gross revenues is a conservative estimate of the labor and overhead costs attributable to the offending products—would be inadequate to prove the amount of a deduction, the court may nonetheless estimate such costs even in the absence of *any* evidence as to such costs. *See Fisher*, 2015 WL 12748029, at *7; *Muhler*, 2014 WL 4269078, at *7. The court exercises its discretion to estimate labor and overhead costs here in order to avoid imposing a punitive sanction on 21st Century. Nutramax has not challenged the reasonableness of the 12% estimates offered by Jumpeter, and, because the only evidence in the record on the issue is Jumpeter's attestation that the 12% figure is reasonable, the court accepts the figure as a reasonable estimate of the labor and overhead costs to be deducted from the $80,313.62 in gross revenues from sales of the offending products. Accordingly, the court finds that it is appropriate to deduct $19,275.27 in labor and overhead costs from the gross sales of the offending products.

### IV. CONCLUSION

Deducting $49,908.21 in raw material costs and $19,275.27 in labor and overhead costs from $80,313.62 in gross revenues from sales of the offending products during the relevant period, the court finds that the amount of net profits from such gross revenues is **$11,130.14**. Pursuant to the court's previous contempt order, 21st Century is hereby **ORDERED** to disgorge this amount to Nutramax.

**IT IS SO ORDERED**.

*J. Michelle Childs*

United States District Court Judge

August 2, 2017
Columbia, South Carolina