# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### ROCK HILL DIVISION

Nutramax Laboratories, Inc., and Nutramax )
Laboratories Veterinary Services, Inc., )
             )
      Plaintiffs, )
             )
   v. )
             )
Manna Pro Products, LLC; Nutri-Vet, )
Wellness, LLC; and 21st Century Animal )
HealthCare, LLC, )
             )
      Defendants. )
_____ )

Civil Action No.: 0:16-cv-01255-JMC

**ORDER AND OPINION**

This matter is before the court on the renewed motion for attorneys' fees and disgorgement of profits filed by Plaintiffs Nutramax Laboratories, Inc., and Nutramax Laboratories Veterinary Services, Inc., (together, "Nutramax"). (ECF No. 60.) For the reasons set forth below, the court **DENIES** Nutramax's renewed motion.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Nutramax filed this trademark infringement action against Defendants Manna Pro Products, LLC, Nutri-Vet Wellness, LLC, and 21st Century Animal HealthCare, LLC ("21st Century") (collectively "Defendants") "alleging that Defendants' 'Petnology Essentials' product line of health supplements for pets infringed on Nutramax's trademark by employing copycat packaging and using improper comparisons to Nutramax's Cosequin product line and that these actions violated South Carolina law on unfair competition." (ECF No. 44 (citing ECF No. 8).) On July 8, 2016, the parties submitted a Joint Stipulation of Settlement and Order ("settlement order"), along with a consent order, dismissing the case under the terms of the settlement order, both of which the court endorsed and entered the same day. (ECF Nos. 31, 32.) In the settlement order,

Defendants, including 21st Century, agreed to, among other things, cease the marketing, distribution, and sale of certain offending products described within the settlement order in exchange for Nutramax's agreement to release Defendants from liability for certain conduct specified in the settlement order. (*See* ECF No. 32.) The parties expressly agreed that the court retained jurisdiction to enforce the terms of the settlement order and that, "in any motion practice or other proceeding initiated to enforce the terms of [the settlement order,] the prevailing party shall be entitled to its reasonable attorneys' fees." (*Id.* ¶¶ 6, 11, 12.)

On August 30, 2016, Nutramax filed a motion asking the court to find 21st Century in contempt, asserting that 21st Century had failed to comply with the settlement order by "continuing to advertise and sell its '21st century Essential Pet Joint Health' ("Essential Pet") product line of health supplements pets, which includes on its packaging the phrase 'compare to the active ingredients in Cosequin® [products].'" (ECF No. 44 at 3 (citing ECF Nos. 34-1 at 3-5; ECF No. 34-3).) After holding a motion hearing on November 29, 2016 (ECF No. 43), to allow the parties to clarify their arguments, the court entered an order (the "contempt order") on December 1, 2016, granting in part Nutramax's motion to the extent it sought "a finding of contempt, an award of attorneys' fees, and an order of disgorgement." (ECF No. 44 at 20.) Accordingly, the court ordered 21st Century to (1) "disgorge to Nutramax its net profits from all sales, on or after July 8, 2016, of products within its Essential Pet line that employ or employed packaging with comparative advertising containing the word Cosequin or that are sold or were sold through a website that employed comparative advertising containing the word Cosequin at the time of the sale" and (2) "pay to Nutramax reasonable attorneys' fees associated with the prosecution of the [contempt] motion." (*Id.* at 21.) Anticipating a dispute on the issue, the court also ordered 21st Century to "file with the court and serve on Nutramax a statement disclosing all of its sales and net profits . . . that

are subject to th[e] disgorgement order and explaining how such net profits were calculated" before attempting to disgorge the profits. (*Id.*)

In compliance with the contempt order, 21st Century, on January 6, 2017, filed a reply to the order setting forth its calculation of the net profits from the sale of the offending products during the relevant period that were subject to disgorgement. (*See* ECF No. 46.) 21st Century asserted that the net profits to be disgorged amounted to $10,912.00. (*See id.* at 3.) Thereafter, Nutramax filed an objection to 21st Century's reply to the contempt order and asserted that, based on the documentation provided by 21st Century, the net profits subject to disgorgement amounted to $94,452.08. (*See* ECF No. 49.) By an August 2, 2017 order, the court found that the amount of net profits subject to disgorgement under its previous contempt order amounted to $11,130.14 and ordered 21st Century to disgorge that amount to Nutramax. (*See* ECF No. 64.)

While the parties' dispute over the amount of net profits to be disgorged remained pending, Nutramax filed its first motion for attorneys' fees and for disgorgement of profits (ECF No. 50), seeking $55,506.00 "to compensate it for its actual, out-of-pocket attorneys' fees incurred in connection with the Contempt Proceeding" (*id.* at 7). In support of its motion, Nutramax attached the affidavit of one of the attorneys representing it in this matter, Morgan T. Nickerson, a partner with K&L Gates LLP in Boston, Massachusetts. (*See* ECF No. 50-1.) In the affidavit, Nickerson, relying on a number of invoices, set forth the rates and hours of the attorneys who worked on the contempt proceeding and declared that, "[b]ased on [his] experience, [his] interaction with other firms and attorneys around South Carolina and the country, and [his] familiarity with rates charged for this type of motion practice, [he] believe[d] that K&L Gates' billing rates [were] reasonable and in keeping with the rates charged by other attorneys and law firms of comparable experience, reputations and skill in similar cases for similar clients" and that "the time expended by . . . K&L

Gates personnel on the Contempt Proceeding . . . [was] reasonable." (*Id.* at 2-5.) In response to the motion, 21st Century argued, among other things, that, under Fourth Circuit precedent, an affidavit from the fee applicant's attorney, without more, is insufficient for assessing whether the fees sought are reasonable. (*See* ECF No. 53 at 6.)

The court agreed with 21st Century that Nickerson's affidavit was insufficient. (*See* ECF No. 59.) The court explained that, in assessing the reasonableness of attorneys' fees, courts in the Fourth Circuit begin by determining the lodestar figure, which is calculated by multiplying the number of reasonable hours by a reasonable rate. (*Id.* at 6-7 (citing *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009); *Grissom v. The Mills Corp.*, 549 F.3d 313, 310 (4th Cir. 2008)).) The court further explained that, in order to determine the reasonable rate, the fee applicant bears the burden of producing specific evidence of the prevailing rate in the relevant community for the type of work for which it seeks an award. (*Id.* at 7 (citing *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)).) Reviewing Nutramax's motion, the court first determined that Nutramax had not shown that the "relevant community" was Boston rather than South Carolina. (*See id.* at 7-8 (citing *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994); *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988)).) The court next determined that an affidavit from Nickerson—a Boston attorney representing Nutramax in the contempt proceedings—was not satisfactory specific evidence of the prevailing rate in the relevant community for the type of work involved. (*See id.* at 8 (citing *Robinson*, 560 F.3d at 245).) Noting Nutramax's assertion that it would provide satisfactory evidence, the court denied the motion without prejudice in order to "allow Nutramax the opportunity to demonstrate that the requested hourly rates are reasonable" in a renewed motion. (*Id.* at 8.)

On May 2, 2017, while the court's decision as to the amount of net profits to be disgorged yet remained pending, Nutramax filed the instant renewed motion for attorneys' fees and disgorgement of profits. (*See* ECF No. 60.) In addition to another affidavit by Nickerson (ECF No. 60-1), Nutramax submits two other evidentiary items in support of its renewed motion. First, Nutramax submits an affidavit from John C. McElwaine, the managing partner of Nelson Mullins Riley & Scarborough LLP's Charleston, South Carolina office. (ECF No. 60-2.) McElwaine's affidavit states that he has practiced law in South Carolina for 22 years, focusing mainly on intellectual property and technology litigation. (*See id.* at 2.) Much of the affidavit well attests to McElwaine's considerable experience as an intellectual property attorney, including his work in other matters with the attorneys representing Nutramax here. (*See id.* at 2-3.) In the affidavit's penultimate paragraph, McElwaine opines that "[b]ased on [his] more than 20 years of experience practicing as an intellectual property attorney specializing in trademark law in South Carolina, . . . [K&L Gates'] hourly rates are in line with the prevailing rates in Columbia, South Carolina for similar services by lawyers of reasonably comparable skill, experience, and national reputation." (*Id.* at 5.)

Second, Nutramax submits a report issued in 2015 by the American Intellectual Property Law Association ("AIPLA"). (ECF No. 60-3.) The AIPLA report details the results of a survey of intellectual property lawyers across the United States. (*Id.*) Nutramax points to several aspects of the AIPLA report. It first points out that, in 2014, partners practicing intellectual property law in private firms in the "Other Southeast," region, which includes all of Florida, Georgia, North Carolina, and South Carolina, except for major metropolitan areas (Miami, Fort Lauderdale, and West Palm Beach, Florida; Raleigh, Durham, Greensboro, Wintson-Salem, and Charlotte, North Carolina; and Atlanta, Georgia), billed at an average rate of $379.00 per hour, with the lowest tenth

percentile billing at $306.00 per hour and the highest tenth percentile billing at $600.00 per hour. (*Id.* at 9-10.) It next points out that, in 2014, associates practicing intellectual property law in law firms in the "Other Southeast" region billed at an average rate of $236.00 per hour. (*Id* at 11.) The AIPLA report lacked sufficient data to calculate a rate for the bottom or top percentiles for such associates, but the rates for the bottom and top quartiles were $178.00 per hour and $288.00 per hour, respectively. (*Id.*) Lastly, Nutramax pointed out that the national average in 2014 for associates with four years of experience practicing intellectual property law (like the K&L Gates associates who worked on the contempt proceeding), billed at an average rate of $308.00 per hour, with the lowest tenth percentile billing at $172.00 per hour and the highest tenth percentile billing at $543.00 per hour. (*Id.* at 12.)

The parties have fully briefed Nutramax's renewed motion, and it is now ripe for disposition. Although the parties' briefing raises a number of issues, the court addresses only a few of them in its analysis below before determining that the motion should be denied.

## II. APPLICABLE LAW

"The proper calculation of an attorney's fee award involves a three-step process." *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013). First, the court must "determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Id.* at 89 (quoting *Robinson*, 560 F.3d at 243). In order to "ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)[, *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989)]." *Boczar*, 738 F.3d at 89 (citing *Robinson*, 560 F.3d at 243-44).[1] Second, "the court must 'subtract fees for hours spent on unsuccessful claims

---

[1] The Fourth Circuit has characterized the twelve *Johnson* factors as follows:

unrelated to successful ones.'" *Id.* (quoting *Robinson*, 560 F.3d at 244). Third, "the court should

award "some percentage of the remaining amount, depending on the degree of success enjoyed by

the [fee applicant].'" *Id.* (quoting *Robinson*, 560 F.3d at 244).

As to the first step, "'the burden rests with the fee applicant to establish the reasonableness

of a requested rate.'" *Robinson*, 560 F.3d at 244 (quoting *Plyler v. Evatt,* 902 F.2d 273, 277 (4th

Cir. 1990)). Although an affidavit by the attorney representing the fee applicant may be useful in

determining a reasonable rate, such an "affidavit, standing alone, is not sufficient evidence." *Id.* at

246 (citing *Plyler*, 902 F.2d at 277). "'*In addition to the attorney's own affidavits, the fee applicant*

*must produce satisfactory specific evidence of the prevailing market rates in the relevant*

*community for the type of work for which he seeks an award*," including, for example, "affidavits

of . . . local lawyers who are familiar both with the skills of the fee applicants and more generally

with the type of work in the relevant community." *Id.* at 244, 245 (emphasis added in *Robinson*)

(quoting *Plyler*, 902 F.2d at 277) (citing *Plyler*, 902 F.2d at 278). A district court "abuse[s] its

discretion by awarding the hourly rates requested by [the fee applicant] in the absence of

'satisfactory specific evidence of the prevailing market rates.'" *Id.* at 245 (ellipsis omitted)

---

(1) The time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Boczar*, 738 F.3d at 89 n.5 (citing *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)).

(quoting *Plyler*, 902 F.2d at 277); *see also Westmoreland Coal Co. v. Cox*, 602 F.3d 276, 290 (4th Cir. 2010).

## III. ANALYSIS

### A. The Fourth Circuit's three-step analysis applies.

Before turning to assess the instant motion under the three-step analysis outlined in the preceding paragraphs, the court must first address a preliminary argument Nutramax seems to raise. Nutramax asserts that, under South Carolina law, the court should award Nutramax the full amount of attorneys' fees it incurred during the contempt proceedings on the ground that, where a party must alert the court to its opponent's contumacious behavior that violates a previous court order, the court should make the party whole by compensating it for its actual, out-of-pocket attorneys' fees incurred in such a proceeding. (*See* ECF No. 54 at 2-4, 6; ECF No. 60 at 2, 4-5, 10.) Throughout its briefing, Nutramax cites to South Carolina authorities regarding the calculation of attorneys' fees to be awarded in contempt proceedings and argues that these authorities require the court to restore Nutramax to a position it would have occupied had 21st Century not engaged in contumacious behavior. (*See* ECF No. 60 at 2, 4-5, 10.) By advancing this argument, the court understands Nutramax to suggest that South Carolina law, not Fourth Circuit law as outlined above, controls the calculation of the attorneys' fees award; that, at a minimum, the reasonableness of the rates at which Nutramax's attorneys billed should be assessed under the six-part test articulated in *Taylor v. Medenica*, 503 S.E.2d 458, 461 (S.C. 1998); and that, perhaps, the reasonableness of the rates need not be assessed at all because, under South Carolina law, the court should seek to reimburse Nutramax the full extent of its legal expenses in litigating the contempt proceeding in order to restore it to its *ex ante* position.

To the extent Nutramax advances this argument or makes these suggestions, the court rejects them. The court notes at the outset the Nutramax points to no authority for the proposition that South Carolina law, rather than federal law, governs the court's consideration of a motion like the one presented here. The omission of any supporting authority for such a proposition is glaring because the court has already applied federal law to the same matter raised in the instant motion when, in its previous order, the court denied Nutramax's first motion for attorneys' fees on the ground that the motion failed to meet the Fourth Circuit's requirements as set forth above. (*See* ECF No. 59.) In any event, there appears no basis for applying South Carolina law here. It is true that state law controls a federal court's decision whether or not to award attorneys' fees when the case is before it under diversity jurisdiction, *see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975), and that, once a federal court exercising its diversity jurisdiction determines that it should award attorneys' fees, the amount of the award should be determined by state law as well, *see Lamb Eng'g & Constr. Co. v. Neb. Pub. Power Dist.*, 103 F.3d 1422, 1434 (8th Cir. 1997) (collecting courts of appeals cases). However, the present case is before the court under federal question jurisdiction. (*See* ECF No. 59 at 4.) Moreover, some courts of appeals have held that the rule requiring conformity to state law does not apply where, as here, the federal court exercises its inherent powers to award attorneys' fees to a party for its opponent's contumacious behavior. *See Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 80 (1st Cir. 2002) ("[W]hen a federal district court sits in diversity jurisdiction, its inherent power to impose monetary sanctions for contumacious conduct during the course of litigation is not circumscribed by the forum state's law regarding the imposition of sanctions."); *accord People ex rel. Abrams v. Terry*, 45 F.3d 17, 23-24 (2d Cir. 1995).

Moreover, the court concludes that the Fourth Circuit's three-step analysis is appropriate when a court awards a fee applicant attorneys' fees as a result of finding that the applicant's opponent is in civil contempt. Although the Fourth Circuit does not appear to have expressly addressed the issue, in *Colonial Williamsburg Foundation v. Kittinger Co.*, 38 F.3d 133 (4th Cir. 1994), it confronted a district court's award of attorneys' fees under circumstances not materially different than those presented here. In the case below, the fee applicant had initiated a trademark infringement action against the alleged infringer; the parties had filed (and the district court had endorsed) a consent judgment preventing the infringer from manufacturing and selling certain products and providing for an award of reasonable attorneys' fees to a party successfully seeking enforcement of the consent judgment; the court had found the infringer in contempt for violating the terms of the consent judgment; and, after reviewing the parties' dispute on the issue, the court had determined the amount of attorneys' fees to be awarded. *See id.* at 134-35; *see also Colonial Williamsburg Found. v. Kittinger Co.*, 792 F. Supp. 1397 (E.D. Va. 1992). Citing to federal law governing awards of attorneys' fees, the Fourth Circuit stated that, when faced with such circumstances, a district court should employ the three-step analysis outlined above. *Colonial Williamsburg*, 38 F.3d at 138. Other district courts within the Fourth Circuit have also applied the three-step analysis to determine the amount of attorneys' fees to be awarded in the civil contempt context. *See Columbia Gas Transmission Corp. v. Mangione Enters. of Turf Valley, L.P.*, 964 F. Supp. 199, 204-05 (D. Md. 1996).

Because Nutramax points to no authority for applying South Carolina law to the instant motion and because the authorities the court has discovered appear in agreement on the matter, the court applies the Fourth Circuit's three-step analysis as described above. In the court's view, application of Fourth Circuit law precludes agreement with Nutramax's suggestions that only the

six factors in *Taylor* need be assessed or that the court need not assess the reasonableness of the rates Nutramax charged at all. *See Rum Creek*, 31 F.3d at 175 ("The hourly rate included in an attorney's fee must . . . be reasonable." (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983))); *Barber*, 577 F.2d at 226 & n.28 (adopting *Johnson*'s 12-factor test); *cf. Beard v. Teska*, 31 F.3d 942, 956 (10th Cir. 1994) ("[T]he Supreme Court has taught in *Blum v. Stenson*[, 465 U.S. 886 (1984),] that the *prevailing market rate* and not the *cost* of providing legal services is the measure of 'a [statutorily-permitted] reasonable attorney's fee . . . .'"), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001).

## B. Nutramax has not shown that Boston is the relevant community.

Having determined that it will apply the Fourth Circuit's three-step analysis, the court next addresses the parties' arguments regarding the "relevant community." As explained above, the first step of the court's analysis is to determine the lodestar amount by multiplying a reasonable rate for the attorneys' work by a reasonable number of hours for the work. In determining the reasonable rate, "the fee applicant must produce satisfactory specific evidence of the prevailing market rates *in the relevant community* for the type of work for which he seeks an award." *Robinson*, 560 F.3d at 244 (emphasis altered). "The relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits." *Rum Creek*, 31 F.3d at 175 (citing *Hanson*, 859 F.2d 313). "Rates charged by attorneys in other cities, however, may be considered when 'the complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally,' and the party choosing the attorney from elsewhere acted reasonably in making the choice." *Id.* at 179 (quoting *Hanson*, 859 F.2d at 317). Thus, the Fourth Circuit has established

> a two-step test for tribunals to utilize when considering whether extrajurisdictional counsel were entitled to home market rates. First, tribunals

should ask if extrajurisdictional counsel rendered services that were truly available in the visited market. Second, tribunals should ask if the party that hired extrajurisdictional attorney chose reasonably, or whether they chose an unnecessarily expensive attorney.

*Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009) (internal citation omitted) (citing *Hanson*, 859 F.2d at 317). The fee applicant bears the burden of establishing that a community other than the one in which the court where the action is prosecuted sits is the relevant community for purposes of determining the prevailing rate. *See Morse v. Republican Party of Va.*, 972 F. Supp. 355, 364 (W.D. Va. 1997) (citing *Spell v. McDaniel*, 616 F. Supp. 1069, 1101 (E.D.N.C. 1985)).

Here, Nutramax argues that it was reasonable for it to choose K&L Gates attorneys out of Boston to represent it in this matter. (*See* ECF No. 60 at 9-10; ECF No. 62 at 4-5.) To the extent Nutramax advances this argument in an effort to establish Boston as the relevant community for purposes of determining the reasonable rate,[2] the court rejects it. Although Nutramax provided evidence that it acted reasonably in choosing Boston attorneys to represent it in this matter because those attorneys serve as Nutramax's national counsel and are most familiar with Nutramax's intellectual properties, Nutramax candidly admits that "[t]o be sure, there are intellectual property lawyers located in South Carolina who could have provided competent representation to Nutramax in this case." (ECF No. 60 at 9.) In the court's view, this admission prevents Nutramax from satisfying the first step of the two-step test in *Holiday* because it amounts to a concession that services rendered by the Boston attorneys were available from attorneys within the District of South Carolina.

---

[2] Some of the K&L Gates attorneys that represent Nutramax in this matter work in the firm's Charleston, South Carolina office. (*See* ECF No. 60 at 9 & n.11.) Nutramax does not appear to ask that the court find that Boston is the relevant community for these attorneys.

Nutramax, however, points to *Aventis CropScience, N.V. v. Pioneer Hi-Bred International, Inc.*, No. 1:00cv463, 2010 WL 2306677 (M.D.N.C. June 8, 2010), in which the district court ruled that the fact that a fee applicant's extrajurisdictional intellectual property attorneys represented the movant nationally, such that they were familiar with the applicant's business and the issues involved in litigation, meant that the extrajurisdictional attorneys "provided a unique service to [the fee applicant] that was not truly available locally." *Aventis CropScience*, 2010 WL 2306677, at *5. Based on this ruling, Nutramax argues that, because its Boston attorneys represent it nationally and are familiar with its business and litigation, the court should find that the services rendered by the Boston attorneys were not truly available in South Carolina.

The court is not persuaded by *Aventis CropScience*. In the court's view, the rule applied in *Aventis CropScience* would transform the first step of the *Holiday* test from an inquiry into whether an attorney with the required skills to undertake the job is available locally to an inquiry into whether an extrajurisdictional attorney can perform the job more efficiently or more capably than a local attorney who undoubtedly has the required skills to undertake the job. The latter inquiry does not appear to be what the Fourth Circuit had in mind for determining whether the services that the extrajurisdictional attorney rendered are truly available locally. *See Robinson*, 31 F.3d at 179 ("Rates charged by attorneys in other cities, however, may be considered when 'the complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally . . . .'" (quoting *Hanson*, 859 F.2d at 317)); *Maceira v. Pagan*, 698 F.2d 38, 40 ("Where it is unreasonable to select a higher priced outside attorney—as, for example, in an ordinary case requiring no specialized abilities not amply reflected among local lawyers—the local rate is the appropriate yardstick."); *Xiao-Yue Gu v. Hughes STX Corp.*, 127 F. Supp. 2d 751, 767 (D. Md. 2001) ("[W]here an attorney knowingly accepts a client that will entail primarily litigation

in another jurisdiction, the prevailing community rate of that jurisdiction should be applied," but "[c]ourts have looked to the prevailing market rate outside of the local community in exceptional circumstances where the litigation was complex or the plaintiff was unable to obtain local counsel."). The *Aventis CropScience* inquiry invites fee applicants to present to the court a potentially vast array of advantages, perhaps particular but perhaps nebulous, from choosing extrajurisdictional attorneys and then to argue that the lack of one of these advantages in choosing local attorneys, who are otherwise capable of the representation, means that the legal services the applicants seek are unavailable in the local market. Not only might this engender unending assertions that some quality that an extrajudicial attorney possesses, no matter how vague or seemingly inconsequential, renders them indispensable, it would also collapse the two steps of the *Holiday* test into one, as any advantage that could be gained from choosing an extrajurisdictional attorney would make the fee applicant's choice reasonable and the attorney indispensable. In the court's view, this type of inquiry is simply unnecessary when the court determines, or, as here, when the fee applicant concedes, that local attorneys with the requisite skill to undertake the job were available. Because Nutramax has not met its burden to show that Boston should be the relevant community, the court concludes that the relevant community for purposes of establishing the prevailing rate is South Carolina.[3]

---

[3] The court recognizes that its decision in this regard is arguable and that the Fourth Circuit has not provided much guidance as to what factors a court should consider in determining whether the services supplied by extrajurisdictional attorneys is truly unavailable locally. However, even assuming that Nutramax's Boston attorneys' service as Nutramax's national counsel and their familiarity with Nutramax's business and litigation should cause the court to conclude that the services they supplied to Nutramax were unavailable from local attorneys, the court would still deny the instant motion. If Boston is the relevant community, then Nutramax has the burden to "produce satisfactory specific evidence of the prevailing market rates in [Boston]," and Nutramax could not rely solely on its "attorney's own affidavits," such as Nickerson's affidavit. *Robinson*, 560 F.3d at 244 (emphasis omitted). Here, aside from Nickerson's affidavit, Nutramax submits McElwaine's affidavit and the AIPLA report. McElwaine's affidavit is not satisfactory specific

14

**C. Nutramax has not produced satisfactory evidence of the rate for the type of work at issue.**

As explained above, the first step of the analysis is to determine the lodestar amount by multiplying a reasonable rate by a reasonable number of hours, and, in determining the reasonable rate, "the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for *the type of work* for which he seeks an award." *Robinson*, 560 F.3d at 244 (emphasis altered). 21st Century argues that the court should not view the type of work involved as trademark infringement litigation, for which an attorney could command a higher rate because of the specialized nature of such litigation, but rather should view it as litigation in civil contempt proceedings, for which higher rates paid for specialized work would be inappropriate, as civil contempt proceedings could be handled by a general litigator. (*See* ECF No. 53 at 5; ECF No. 61 at 3.) In reply, Nutramax argues that the proper rate to consider is for the work of intellectual property lawyers and not for the work of general litigators because this case began as a trademark infringement action, and "it would be absurd" to believe that Nutramax should have to change its entire legal team merely because the contempt proceedings for which attorneys' fees are sought could have been handled by general litigators rather than specialist trademark infringement litigators. (ECF No. 62 at 5.) The court notes that both parties appear to agree (and the record supports) that Nutramax seeks an award of attorneys' fees only for the work performed for the contempt proceedings and that work done during the contempt proceedings could have been

---

evidence of the prevailing market rate in Boston because McElwaine is not a Boston attorney and because his affidavit attests only to the reasonableness of the rates in South Carolina, not in Boston. *See id.* at 245 (accepting as satisfactory evidence "affidavits of . . . *local lawyers* who are familiar both with the skills of the fee applicants and more generally with the type of work *in the relevant community*." (emphasis added)). The AIPLA report is not satisfactory for the reasons outlined in Part III.C, *infra*. Because Nutramax fails to provide satisfactory specific evidence of the prevailing rate in Boston, the court would be compelled to deny its renewed motion for attorneys' fees. *See Cox*, 602 F.3d at 290; *Robinson*, 560 F.3d at 245; *Plyler*, 902 F.2d at 277.

performed by general litigators. The parties seem to disagree on whether a court, in determining the reasonable rate, is permitted to (or, if permitted, should) vary the rate at which an attorney's fee is calculated based on the different work the attorney performs during the course of the representation.

As the Fourth Circuit has observed, "courts have adopted varying approaches to the problem of valuing legal services, with some utilizing different rates for different types of work, particularly in-court and out-of-court or primary and secondary services and others applying uniform rates for all services rendered." *Spell v. McDaniel*, 824 F.2d 1380, 1403 (4th Cir. 1987) (internal citations omitted) (citing *White v. City of Richmond*, 713 F.2d 458, 461 (9th Cir. 1983); *Maceira*, 698 F.2d at 40-41; *Whitley v. Seibel*, 676 F.2d 245, 253-54 (7th Cir. 1982); *Miles v. Sampson*, 675 F.2d 5, 9 (1st Cir. 1982) (Breyer, J.); *Bonner v. Coughlin*, 657 F.2d 931, 937 (7th Cir. 1981); *United Nuclear Corp. v. Cannon*, 564 F. Supp. 581, 589 (D.R.I. 1983); *Langdon v. Drew Mun. Separate Sch. Dist.*, 512 F. Supp. 1131, 1139 (N.D. Miss. 1981)); *accord Beard*, 31 F.3d at 957-58 (citing, *inter alia*, *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 591-93 (3d Cir. 1984)). Thus, in some jurisdictions, "court[s] ha[ve] the discretion to award different hourly rates for different types of work, and for work done at different stages of the case." *Rogers v. Matta*, 655 F. Supp. 39, 43 (D. Mass. 1986) (internal citation omitted) (citing *Wojtkowski v. Cade*, 725 F.2d 127, 131 (1st Cir. 1984); *Miles*, 675 F.2d at 9). Indeed, these courts have specified that "different hourly rates are appropriate when the same attorney performs different kinds of work." *Miles*, 675 F.2d at 9 (citing *Copeland v. Marshall*, 641 F.2d 880, 892 (D.C. Cir. 1980) (en banc) ("[T]here may be more than one reasonable hourly rate for each of the attorneys, and for each of the kinds of work, involved in the litigation.")). The underlying rationale for courts to apply different rates to different kinds of work done by the same attorney or to different stages of the

litigation appears to be a corollary to the principle embraced by the *Johnson* court that "[i]t is appropriate to distinguish between legal work, in the strict sense," and non-legal work, "which can often be accomplished by non-lawyers but which a lawyer may do," because "[s]uch non-legal work may command a lesser rate," as "[i]ts dollar value is not enhanced just because a lawyer does it." 488 F.2d at 717. The corollary is that it is appropriate to distinguish between different legal work performed by the same attorney or between different stages of the case because certain types of legal work or certain stages of a case command lesser rates, and the dollar value for the work is not enhanced merely because an attorney, who could command a higher rate for different legal work or at a different stage of the litigation, performs the work.

Of course, other courts, confronted with the same circumstances, apply uniform rates for all legal (and non-legal) services rendered. *See Spell*, 824 F.2d at 1403 (citing *White*, 713 F.2d at 461; *Maceira*, 698 F.2d at 40-41; *Bonner*, 657 F.2d at 937; *Spell*, 616 F. Supp. at 1103); *see also Beard*, 31 F.3d at 958. The underlying rationale to apply a uniform rate was aptly stated in *Beard*:

> the choice of a single figure as the prevailing market rate for lawyers' time involves the recognition that one hour's activity may sometimes be of enormous value to a client and another hour's activity may contribute little (or even nothing) to the overall result, but that a district court's adoption of a composite hourly rate—reflecting as it does a practice common to the profession—is a reflection of the average value of all the services rendered by a lawyer.

*Beard*, 31 F.3d at 958 (internal citation omitted).

The Fourth Circuit has not taken a side on the issue and appears to have left it to the discretion of the district courts whether to apply a uniform rate or instead to apply different rates. *See Spell*, 824 F.2d at 1403. However, the Fourth Circuit, at least in a statutory fee-shifting context, has cautioned that attorneys who can command premium rates because they engage in specialty practice areas should not mechanically be awarded those premium rates when the case for which

fees are sought involves a type of work that is not within the attorneys' specialty practice area. *See*

*Buffington v. Balt. Cnty.*, 913 F.2d 113, 129-30 (4th Cir. 1990) (citing *Shakopee Mdewakanton*

*Sioux v. City of Prior Lake,* 771 F.2d 1153, 1161 (8th Cir. 1985), for the proposition that "an

attorney's own billing rate is not a reliable measure where he does not specialize in the area of law

that is the subject matter of the lawsuit"); *accord Trimper v. City of Norfolk*, 846 F. Supp. 1295,

1304-06 (E.D. Va. 1994).

Here, the court declines to make any broad conclusions regarding when a court should

apply a uniform rate or when it should apply different rates for different types of work performed

in the same case. Instead, the court tailors its decision to the facts presented by the instant case.

Where there is no dispute (1) that the fee applicant seeks an award for only the work performed in

a contempt proceeding by attorneys who practice trademark infringement litigation; (2) that the

work performed in the contempt proceeding did not involve the type of work that is within the

specialty practice area of trademark infringement litigation; and (3) that the work performed in the

contempt proceeding could have been performed by general litigation attorneys, then the "type of

work" for which a fee applicant is required to submit satisfactory specific evidence as to a

prevailing rate in the relevant community is not trademark infringement litigation but is rather civil

contempt litigation that a general litigator could perform.[4] The court is persuaded that, in these

particular circumstances, it is appropriate to distinguish between work comprising trademark

---

[4] Nutramax argues that, if the court decided that the "type of work" at issue is civil contempt litigation rather than trademark infringement litigation, this necessarily would result in the absurd conclusion that Nutramax should have obtained different counsel to litigate the contempt proceedings. The court does not believe that such a conclusion is the necessary result of its decision. As the above authorities suggest, the rationale underlying the court's decision is not that a fee applicant should have obtained different attorneys but rather that those attorneys should have charged different rates or, more properly, that it is not reasonable to force a fee applicant's opponent to pay premium rates for non-premium work.

infringement litigation performed by Nutramax's attorneys, for which they could command a premium rate, and work comprising civil contempt litigation, for which lesser rates obtain because the dollar value for such general work is not enhanced merely because a trademark infringement attorney does it. The court is further persuaded that the rationale for applying a uniform rate in these particular circumstances holds less weight because where, as here, the work for which the fee is sought includes no hours during which the attorneys engaged in work within their specialty practice area. Thus, the court concludes that, in order to meet the Fourth Circuit's requirement for establishing a reasonable rate, Nutramax must submit satisfactory specific evidence of the prevailing market rates in South Carolina for civil contempt or similar litigation. *See Robinson*, 560 F.3d at 244.

Nutramax has not submitted the requisite evidence. First, the AIPLA report sets forth rates charged by attorneys practicing intellectual property law and does not purport to set forth rates that general litigators may charge for work such as litigating in civil contempt proceedings. Next, although McElwaine's affidavit notes the hourly rates charged by Nutramax's attorneys who "worked on the contempt proceeding" and opines that "these hourly rates are in line with the prevailing rates in Columbia, South Carolina for similar services," (ECF No. 60-2 at 3-4), McElwaine never defines the type of work at issue. Moreover, the fact that McElwaine bases his opinion on his "more than 20 years of experience practicing as an intellectual property attorney specializing in trademark law in South Carolina," strongly suggesting that he understands the "type of work" at issue to be trademark infringement litigation. In the court's view McElwaine's affidavit is not satisfactory specific evidence as to the prevailing market rate for litigating civil contempt proceedings or similar matters. Lastly, Nutramax may not rely solely on its "attorney's own affidavits," such as Nickerson's affidavit. *Robinson*, 560 F.3d at 244. Because Nutramax fails to

provide satisfactory specific evidence of the prevailing market rate in South Carolina for civil contempt or similar litigation, the court is compelled to deny its renewed motion for attorneys' fees. *See Cox*, 602 F.3d at 290; *Robinson*, 560 F.3d at 245; *Plyler*, 902 F.2d at 277.

**D. The court declines to exercise its discretion to rely on its own knowledge or expertise.**

Next, 21st Century suggests that, because Nutramax has failed to provide satisfactory evidence of the prevailing rate, the court should determine on its own the reasonable rate to apply in this matter. (*See* ECF No. 61 at 2, 4.) Although 21st Century does not cite authority on the issue, the District of South Carolina has before ruled that "the court may draw[] on its own knowledge of litigation rates often charged in this District" when the fee applicant fails to provide satisfactory evidence to support the rates it requests. *Joe Hand Promotions, Inc. v. Scott's End Zone, Inc.*, 759 F. Supp. 2d 742, 754 (D.S.C. 2010). Other district courts in the Fourth Circuit have reached the same conclusion. *See Silverdeer St. John Equity Partners I LLC v. Kopelman*, No. 5:11-cv-00095-JG, 2012 WL 5879752, at *2 (E.D.N.C. Nov. 21, 2012); *Morris v. Lowe's Home Ctrs., Inc.*, No. 1:10cv388, 2012 WL 5338577, at *5 (M.D.N.C. Oct. 30, 2012); *Irwin Indus. Tool Co. v. Worthington Cylinders Wis., LLC*, 747 F. Supp. 2d 568, 593 (W.D.N.C. 2010); *Const. Party of W. Va. v. Jezioro*, No. 2:08-cv-61, 2009 WL 2843374, at *6 (N.D.W. Va. Aug. 31, 2009); *CoStar Grp., Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000); *Cook v. Andrews*, 7 F. Supp. 2d 733, 736 (E.D. Va. 1998); *cf. Beattie v. CMH Homes, Inc.*, No. 3:12-2528, 2015 WL 4163337, at *3 (S.D.W. Va. July 9, 2015).

The Fourth Circuit appears to have addressed the issue three times. In the first instance, the Fourth Circuit, in the only published decision on the issue, ruled that it was not an abuse of discretion for a magistrate judge to rely on his own knowledge of the prevailing rates in the community in which his court was situated when the fee applicant failed to submit satisfactory

evidence of the prevailing rate. *Rum Creek*, 31 F.3d at 174. Next, in an unpublished decision, the Fourth Circuit ruled that a district judge did not abuse his discretion by relying on his own knowledge of the prevailing rates in the community in which his court was situated after the fee applicant provided what appears to have been unsatisfactory evidence on the matter. *Reaching Hearts, Int'l, Inc. v. Prince George's Cnty.*, 478 F. App'x 54, 59 (4th Cir. 2012). However, the Fourth Circuit emphasized two points in *Reaching Hearts*. It noted first that the district judge had "explained that he had been responsible for billing at the law firm where he practiced prior to his appointment to the bench in 2003 and that he knew the rates charged by attorneys at that local firm for all types of litigation up through that time in the relevant market." *Id.*[5] It noted second that "significantly [] there was a lack of comparable rates for [the type of] work in [the relevant community] and even nationwide, in view of [the] novelty [of the type of work] at the time." *Id.* at 59. In another unpublished decision and the most recent instance in which it has addressed the issue, the Fourth Circuit was confronted with a fee applicant who "had presented only testimony from its own attorney on the reasonableness of its fees" and a bankruptcy judge who had relied on his own knowledge of attorneys' fees awards in bankruptcy litigation to determine that the requested rates were reasonable. *In re Botero-Paramo*, 483 F. App'x 779, 783-84 (4th Cir. 2012). In assessing a challenge to the bankruptcy judge's reliance on his own knowledge, the Fourth Circuit said:

> Although this court has reversed and remanded fee awards where the only evidence that the prevailing party presented was affidavits from her own counsel, we have not previously considered whether a bankruptcy court may consider its own expertise when determining the reasonableness of the rate charged by attorneys as the bankruptcy court did in this case. Several of our sister circuits have recognized that when the prevailing party has failed to

---

[5] The fee applicant sought attorneys' fees for work done from 2005 to 2008, a relatively short time after the district judge's appointment. *See Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 779-80 (D. Md. 2008).

provide adequate evidence of reasonable fees, a district court may rely on its own expertise in determining a reasonable hourly rate, as the bankruptcy court did here. Here, the bankruptcy court observed that it had several similar cases before it in which it had awarded attorneys' fees. It determined that [the fee applicant] sought fees that were within the range of fees awarded in those similar cases. Based on these comparables, it then thoroughly analyzed whether certain costs that [the fee applicant] claimed were better considered overhead and whether certain issues were overlawyered. Although this approach lacked the usual expert testimony, because nearly every case on a bankruptcy court's docket involves reviewing attorneys' fees and costs in the community, we find that bankruptcy courts are, in certain circumstances, particularly qualified to determine the reasonableness of fees based on their own expertise.

*Id.* at 788-89 (internal citations omitted).

Based on the only published decision by the Fourth Circuit on the issue, it is clear that district courts have discretion to rely on their own knowledge or expertise to determine the prevailing rate in the community in which the court is situated for the type of work involved when the fee applicant fails to provide satisfactory evidence as required by Fourth Circuit precedent. *See Rum Creek*, 31 F.3d at 174.[6] However, the Fourth Circuit's more recent unpublished decisions, although not precedential, caution that the district court's discretion in this regard is not without limitation. Specifically, it appears that a district court generally should rely on its own knowledge or expertise regarding the prevailing rates in the community in which it sits for the type of work involved only if it has some independent basis for that knowledge or expertise. For instance, a district judge might have an independent basis of knowledge or expertise if, shortly before his appointment to the bench, he was intimately familiar with the billing practices for the type of work

---

[6] However, following *In re Botero-Paramo*, at least one district court in the Fourth Circuit has expressed doubt that, in the absence of satisfactory evidence from the fee applicant, a district court should rely on its own knowledge. *See EMI April Music, Inc. v. Garland Enters., LLC*, No. DKC 11-3352, 2012 WL 2342994, at *2 (D. Md. June 19, 2012) ("There is some question whether, in the absence of independent evidence of the prevailing market rates, the court may rely on its own expertise concerning those rates.").

at issue in his role as an attorney in the relevant community. *See Reaching Hearts*, 478 F. App'x at 59. Similarly, a district court might have an independent basis of knowledge or expertise to review a particular application for attorneys' fees if there are a sufficient number of cases on the court's docket that involve reviewing other applications for attorneys' fees for the same type of work and in the same community. *See In re Botero-Paramo*, 483 F. App'x at 788-89; *see also Nat'l Elec. Benefit Fund v. Mirarchi Bros., Inc.*, No. DKC 11-2621, 2013 WL 2637524, at *5 (D. Md. June 11, 2013) ("[W]hile the Fourth Circuit has not made explicit that the reasoning of *In re Botero–Paramo* may apply 'in certain circumstances' outside the bankruptcy context, it is fairly inferable that it may, particularly where the court has "had several similar cases before it in which it has awarded attorneys' fees' and the fees sought by the prevailing party are 'within the range of fees awarded in those similar cases.'" (brackets omitted) (quoting *In re Botero-Paramo*, 483 F. App'x at 789)). However, this limitation on the district court's discretion might be less rigid where the work for which attorneys' fees are sought is of a type that is novel or uncommon, such that the fee applicant might be unable to obtain evidence regarding comparable rates charged for the same or a similar type of work. *See Reaching Hearts*, 478 F. App'x at 59. [7]

---

[7] It is notable that language in the decisions from district courts in the Fourth Circuit have suggested some of the same limitations. *See Beattie*, 2015 WL 4163337, at *3 ("[T]he Court applies its own knowledge of the market, which includes having made prior fee determinations and discussed such matters from time to time with counsel appearing in front of the Court."); *Hirst v. Tiberghien*, 6:13-00729-JMC, 2013 WL 6827813, at *4 (D.S.C. Dec. 20, 2013) ("[T]he court accepts the hourly rates" in part because of the fee applicant's "unopposed suggestion that [cases of the type at issue] do not routinely occur in this community and the rates are reasonable based on the novelty and complexity of the relevant issues."); *Nat'l Elec. Benefit Fund*, 2013 WL 2637524, at *5 (noting "the court has previously considered fee petitions in a number of similar cases"); *Morris*, 2012 WL 5338577, at *5 ("To enhance the Court's knowledge . . . , the Court has researched attorney fee awards made in this District and the two neighboring North Carolina federal districts over the last decade."); *id.* (referring to court's "preexisting knowledge and experience with the relevant legal market"); *BiotechPharma, LLC v. W.H.P.M., Inc.*, No. 1:11-cv-00444 (TSE/IDD), 2012 WL 253090, at *4 (E.D. Va. Jan. 26, 2012) (referring to "a number of recent holdings in this division"); *Textron Fin. Corp. v. Seven Falls Golf & River Club, LLC*, No.

Here, the court concludes that it lacks an independent basis of knowledge or expertise to determine the prevailing rate in South Carolina for litigating civil contempt or similar proceedings and, therefore, declines to exercise its discretion to determine the a prevailing rate based on its own knowledge and experience in the absence of satisfactory evidence. First, the undersigned does not have extensive experience billing clients for litigating civil contempt proceedings, and, in any event, the undersigned's experience with any such billing practices during her time as an attorney in this district would not be of sufficiently recent vintage. *See Reaching Hearts*, 478 F. App'x at 59; *Reaching Hearts*, 584 F. Supp. 2d at 779-80.

Second, the court has located only three similar cases in the district's docket, in which the court awarded attorneys' fees for the work of litigating civil contempt or similar proceedings, and each of them is distinguishable from the instant case. In the most recent, Judge Lewis approved a rate of $330.00 per hour for senior attorneys and partners who litigated a motion for sanctions, as well as a rate of $150.00 per hour for paralegals. *See Monster Daddy v. Monster Cable Prods.*, No. 6:10-1170-MGL, 2014 WL 1094550, at *6 (D.S.C. March 19, 2014). Aside from apparently not involving junior associates, the *Monster Daddy* case also differs from the instant case in that Judge Lewis specifically found that some of the work of litigating the motion for sanctions involved the attorneys' employing their expertise as intellectual property litigators. *See Monster Daddy v. Monster Cable Prods., Inc.*, No. 6:10-1170-MGL, 2014 WL 2780331, at *9 (D.S.C. June 19,

---

1:09cv312, 2011 WL 251115, at *9 (W.D.N.C. Jan. 25, 2011) (referring to court's "familiarity with hourly rates charged in this District" and "experience with the relevant market"); *Joe Hand*, 759 F. Supp. 2d at 754 (referring to court's "own knowledge of litigation rates *often charged in this District*" (emphasis added)); *Joe Hand Promotions, Inc. v. Precint Bar-DAXLAM, Ltd.*, No. 3:10-cv-00199-CMC, 2010 WL 3420189, at *4 (D.S.C. Aug. 23, 2010) (referring to court's knowledge of rates that "are within the normal range for similar work in this geographic area"); *Jefferson v. Briner, Inc.*, 461 F. Supp. 2d 430, 439 (E.D. Va. 2006) (referring to "other fee petitions that the court has considered in other cases over time").

2014). Next, in a 2013 case, Judge Norton approved rates of $300.00 per hour for partners and senior attorneys and $125.00 per hour for paralegals for their work in litigating a motion for sanctions. *Grayson Consulting, Inc. v. Cathcart*, No. 2:07-02992-DCN, 2013 WL 436217, at *2-3 (D.S.C. Feb. 5, 2013). As in *Monster Daddy*, the *Cathcart* case does not appear to involve rates for junior associates, and further, in arriving at the rates, Judge Norton relied on other rates approved in two other cases in the district in which the work at issue did not involve litigating a motion for sanctions or similar proceedings. *See id.* at *3. Lastly, in a 2008 case, Magistrate Judge Catoe approved a rate of $200.00 per hour for the work of litigating a motion for sanctions and a motion for summary judgment and for conducting a deposition. *Lasher v. Day & Zimmerman Int'l, Inc.*, No. 6:06-1681-WMC, 2008 WL 4951059, at *2 (D.S.C. Nov. 17, 2008). Not only is the case somewhat dated, but it expressly approves a rate for work involving other than just the motion for sanctions and, for this reason, is of little use here. In sum, there are very few cases similar to the instant matter from which the court might draw some knowledge or expertise as to a prevailing rate, and even those cases involve circumstances which render the rates approved therein not readily applicable to the instant matter.

Third, nothing in the record indicates that the Fourth Circuit's reasons for admonishing courts to limit their discretion in this area should be more loosely applied in the instant matter. Unlike the type of work at issue *Reaching Hearts*, litigating civil contempt or similar proceedings is not so novel or uncommon in this district that Nutramax might be unable to obtain evidence of the prevailing rate for such work.

Because the court lacks an independent basis of knowledge or expertise regarding the prevailing rate in South Carolina for litigating civil contempt or similar proceedings and because the lack of such an independent basis, absent mitigating circumstances, cautions against the court's

exercising its discretion to determine the prevailing rate based on its own knowledge or expertise, the court declines to do so here.

**E. Nutramax's renewed motion for disgorgement is moot.**

Lastly, the court notes that the renewed motion for attorneys' fees, filed before the court entered its August 2, 2017 order resolving the parties' dispute over the amount of net profits to be disgorged and ordering 21st Century to disgorge to Nutramax $11,130.14 in net profits, is also styled as a renewed motion for disgorgement of profits. (*See* ECF No. 60; *see also* ECF No. 64.) In the motion, Nutramax requests the court enter an order requiring 21st Century to disgorge the net profits from the sales of the offending products.[8] (*See* ECF No. 60 at 2.) To the extent the instant motion requests entry of an order requiring 21st Century to disgorge the net profits, that portion of the motion is moot because the court has already entered such an order. (*See* ECF No. 64.)[9]

## IV. CONCLUSION

The court is loath to deny Nutramax's renewed motion for attorneys' fees, as doing so portends an accrual of even more attorneys' fees in litigating a third motion. However, for the

---

[8] In its renewed motion, Nutramax purports to "incorporate[] by reference the arguments" in its objection to 21st Century's reply to the court's contempt order (ECF No. 60 at 1 n.2) and purports to do so again in its reply to 21st Century's response to the instant motion (*see* ECF No. 62 at 1 n.1). Not to be outdone on this score, 21st Century, in its response to the instant motion, purports to incorporate by reference its response to Nutramax's first motion for attorneys' fees. (*See* ECF No. 61 at 1.) The practice of incorporating an entire memorandum by reference into another memorandum is disfavored. *See South Carolina v. United States*, 232 F. Supp. 3d 785, 795-96 (D.S.C. 2017). The court encourages the parties to forego the practice and to present to the court any arguments that it should consider by placing them into the text of their memoranda rather than by incorporating them by reference to other memoranda.

[9] To the extent the motion requests disgorgement of net profits in the amount of $94,452.08 (*see* ECF No. 60 at 2), that portion of the motion is denied for the reasons set forth in the court's August 2, 2017 order (*see* ECF No. 64.)

reasons above, the court believes it is compelled to deny the motion. Though it may be small consolation, the court notes that its foregoing analysis should guide any litigation on a subsequent request for attorneys' fees, as it should be clear that, in order to succeed, Nutramax must submit satisfactory evidence of the prevailing market rate in South Carolina for the work of litigating civil contempt or similar proceedings, such as an affidavit from an attorney with knowledge of such rates.

For the foregoing reasons, Nutramax's renewed motion for attorneys' fees and for disgorgement of profits (ECF No. 60) is hereby **DENIED**. To the extent the motion seeks entry of an order awarding Nutramax attorneys' fees, the denial is **WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.

J. Michelle Childs

United States District Court Judge

August 14, 2017
Columbia, South Carolina